I wonder if counsel for Mr. Taylor and the state's attorney would step up and identify yourselves for the record. Melissa Chang, I represent Alexander Taylor. Stacia Weber on behalf of the people of the state of Illinois. Is it Chang? Yes. Okay. You each have 15 minutes and you may save out from your 15 any portion you wish for a response, Ms. Chang. May I please the court? I'd like to reserve three minutes for rebuttal. You may. In our briefs are four issues and I welcome questions on any of these issues, but I'd like to concentrate this morning on two issues, fitness and Batson. Alexander Taylor was a patient in the psychiatric ward of Lincoln Park Hospital and was refusing medication when several nurses approached him with a mattress and tried to restrain him and he resisted those efforts. When he was charged with this offense, there was a determination that he was not fit to stand trial because he wasn't able to assist counsel in his defense. And based on this determination, the judge determined that he was in fact not fit to stand trial and he was institutionalized. Six months later, stipulated testimony showed that he was now fit to stand trial with medication. And although the judge never made any findings or acknowledged the stipulation, the case proceeded as if he had been restored to fitness. I mean, weren't there two physicians that said he was fit to stand trial and wasn't there a private physician that the defendant obtained himself, though it's not in the record, the lawyer said that even that doctor found him fit to stand trial. Yes, Your Honor, there were two findings, but it's important to note that those findings were only contingent findings of fitness. They only said that he was fit to stand trial with medication. The third psychiatrist, we don't have any information on when that evaluation was done or what type of finding they entered. So what should a court do when a court has now three evaluations and a person is fit to stand trial based on medication? Should they keep on reaching out until they find one that complies where he's not fit? I mean, how far must the court go? Well, in this case, there had to be at a very minimum an actual consideration of the stipulated finding and a weighing of the prior determination. So you're really relying most heavily on the silence of the trial judge with respect to the issue? No, Your Honor, that's one aspect. One aspect. What's the other aspect? Well, the first one is that there has to be an affirmative exercise of judicial discussion, but the second is that that finding has to be supported by a sufficient factual basis. So if it's not supported, then even if you had entered a finding, it still wouldn't have been correct. And the trial court has to be alert to, as Justice Gordon pointed out, the trial court does have to be alert to any change in circumstances. I think it's important to note that the very first expert's opinion, the expert who testified at the original fitness hearing, Dr. Messina, she had evaluated Mr. Taylor when he was at CIRMAC. They were talking about fitness to stand trial? Correct. OK. What are the criteria for that? Well, number one, they have to have an understanding of the proceedings, the nature and object of proceedings. And number two, they have to have the ability to assist with counsel. With counsel. Right. Is there any evidence whatsoever that Alexander didn't understand what was going on? There is evidence. So after... The man keeps insisting that, you know, I want to plead not guilty to this charge. Right, but the... Doesn't that at least indicate some understanding of what the context of the hearing is all about? But he indicated that he wanted to plead not guilty and not assert the incentive defense because the guards at Chester were strangling him and had almost killed him. He misinterpreted his legal rights, but that isn't the same thing as understanding the nature of the charge against him, is it? Well, if he doesn't understand the defenses that he's waiving, he doesn't understand what counsel is... No, he has to understand the nature of the charge against him, right? The nature and object of the proceedings, yes. But he also has to be able to assist counsel with a reasonable degree of rational understanding. And why... I mean, most attorneys in a situation like this would advise their client to plead not guilty and shut up. And that's exactly what he did, wasn't it? Well, an assertion of incentive defense is not inconsistent with a plea of not guilty. A person can plead not guilty and still assert self-defense. I'm troubled by your position that somebody who pleads not guilty puts himself in any jeopardy whatsoever with respect to the situation. Your Honor, it's not simply that he... Are you suggesting that really on a more informed basis, he might have pled guilty and taken the plea? Your Honor, it's not just his misinformation. It's... you have to look at the totality of the circumstances. I am looking at the totality of the circumstances. And at the end of the day, the best thing a defendant in a criminal case can ever do is to plead not guilty and let his lawyer do his talking for him. Well, that is one aspect of being a defendant, but the reason that... And here he insisted on that, didn't he? But it's not just what the defendant wants. Because if the defendant is not competent, it doesn't matter what he wants. That's why we have that second prong, and courts have repeatedly emphasized they have to be able to assist counsel with a reasonable degree of rational understanding. It's not just that they have to be able to understand the judge. Was there any evidence here that he could not assist his counsel? Well, counsel had said that he was not cooperating with him, and... You mean after the reports, the three different reports came in? After those reports. What did counsel say? Counsel said that it was in his best... That she wanted the trial court to examine him on competency to waive the insanity defense, because he was not cooperating on insanity defense, and she believed that it was in his best interest to assert the insanity defense. Yeah, but he felt it was in his best interest to stay out of where he would have ended up had he followed her advice. This sounds to me like a man who understood what the consequences were with respect to the legal proceeding before him. He just disagreed with his lawyer about the outcome. He felt that he could... Obviously. And he said it on the record. He said, I don't want to go back to that place down there, which is where you're going to send me if I go along with my lawyer's advice. I'm going to go back to Chester, and they almost killed me down there. Right, but again, you have to look at the totality of the circumstance. And then he said, I want to plead not guilty, because I don't think I did what they say I did. Right, but if you look at his history of mental illness, he was hospitalized for mental illness at the time of this offense, and the reason, the whole reason for being of this offense was he was being adamant, he was refusing medication, and he didn't want to take it. Yeah, that's right. And then he was determined not to be fit specifically, because he was not able to... But are you suggesting that it's evidence, overwhelming evidence of his inability to cooperate with counsel because he disagreed with her analysis of where he should go on the case? That is simply one aspect. One aspect. Yes. Do you know any Illinois cases where the state has two witnesses that says that the man is capable of standing trial and assisting his counsel, and then the defense goes out and gets an examination, and they find him fit? Do you find any case whatsoever under that fact, scenario, where the court should do more? Well, there are actually two cases that are very, very relevant. Number one is Green. In that case, there were two written reports produced, and there are stipulations as to the existence of those reports finding the defendant fit, not even fit with medication, and there was no examination there by a defense doctor, was there? Your Honor, I'm not sure in those, in Green, if it was... who had instigated the investigations. I mean, don't normally defense lawyers go out and get the most favorable type of doctor that they possibly can? Yes, Your Honor, but the second case... They couldn't get one here that says he was unfit, could they? Your Honor, the second case I want to mention is Pate v. Robinson, a U.S. Supreme Court decision, which actually examined Illinois law, and in those cases, if you look at the facts of Pate v. Robinson, there were at least three determinations of fitness by experts, and yet the court said that when the totality of the circumstances indicate that the defendant is not fit, it's incumbent upon the trial court to hold a fitness hearing and to make sure that he is, in fact, fit, because the concept of fitness changes over time. In fact, if you look at the stipulated testimony of Dr. Kulik, the one that was entered right before the hearing, it said that the defendant is able to assist with counsel if he chooses to do so, and that he was fit with medication, okay? But after this report, he was transferred to CIRMAC, which is where he was evaluated the first time by Dr. Messina, and where she said he wasn't receiving his medication. We don't know if during the year after that first, Dr. Kulik's written report. But there's a second report, isn't there? The very last report that we have is from December of 07, which is eight months before trial and a year before sentencing, and there's never an inquiry after that whether he's taking his medication. There's a first report that says he's fit with medication, where he said if he chooses to do so. How many months later is the second report? What I was referring to, that report, that was the very last report, where he was fit and he was able to assist with counsel if he chose to do so. That was private psychiatrist. No, that was Dr. Kulik. That was the psychiatrist from CIRMAC. The first report Dr. Messina, who examined him while he was at CIRMAC, was March of 2007, so about a year and a half before trial, a little bit more. So the main things of even the very, very last written evaluation was that he was only fit with medication and that he could only cooperate with counsel if he chose to do so. But there was no inquiry whatsoever in the entire year after that whether or not he was taking medication. And there was evidence, first of all, that CIRMAC didn't provide him with medication in the past, and number two, that he refused medication in the past. So I think it's important to look at all of the circumstances and not just his behavior at the insanity defense was certainly one factor. When he says, the guards at Chester strangled me, I've been bitten by a rat, I need to get out of this place before I die, that's indication that he does not have a sound and competent mind. Well, no, it also may mean he has a very clear awareness of his surroundings. All of those things could have happened, right? I mean, was there any evidence to contradict any of the statements about respect to the atmosphere in which he was being confined? No, Your Honor, but unless this Court believes that the guards at Chester truly tried to kill him, I don't think that you can credit his statements. Well, it could very well be that the trial judge in this case had some familiarity with the Chester facility and could give some credence to an inmate there that they tried to kill him. It could be, but if you look at, it wasn't just before trial. There was certainly anecdotal information available to the trial judge with respect to the Chester facility, I'm sure. At the end of sentencing, at the motion to reconsider sentence, the trial judge specifically noted, I watched the defendant dwindle away to the shell of a person that he once was and I don't know what the cause of it is. The trial court had evidence that Taylor's mental state was deteriorating and therefore it was his duty to revisit the issue, to order a new evaluation and to make a determination. He couldn't just gloss over all of these factors that suggested that the defendant wasn't fit to stand trial. Even the defendant's own insistence that he was able to understand what was going on and wanted to plead not guilty because he didn't think he was guilty of the crime charged. No, Your Honor. You see the catch-22 you've put, and I use catch-22 advisedly in this context. I do, Your Honor. What happens to a mental patient when a mental patient is in a facility where he's considered to be a mental patient? I understand that, Your Honor, but if you look at Pavey Robinson, if you look at all of the cases we've studied, Green, Myers, Contorno, the whole point of competency is that defendant cannot waive his own competency if he's not competent. And we're not going to just take his insistence, his desires at face value because we have to examine if he's actually competent to stand trial. If he's not competent, then none of his subsequent desires are really perpetutive of what should be happening. Okay. I think we understand your position, counsel. Do you want to sum up? We'll give you an opportunity to respond. Okay. Do I have time to address the second issue? Yes, you do. Okay. I'd like to address the Batson issue. The trial court here erred in denying the Batson motion at the third stage because the prosecution ---- Let me ask you this. There were 22 venereal people. How many of them were African American? Your Honor, we don't have all of that information. How many African Americans were on this jury? We don't have that information. The first panel, there were three out of four, weren't there? There were. Okay. Proceed with your argument. What we do have is that the trial court found that there was a prima facie case of intentional discrimination and therefore required the prosecutor to state their reasons for dismissing the jurors. The proffered reason was that they were social workers. And this didn't ---- Number one, it didn't make sense in the context of this case because the victims were nurses and counselors. And number two, the prosecution accepted four other social workers. And number three, the prosecution never accepted or never questioned any of the accepted or rejected jurors about their profession and never asked them whether or not their profession might affect their ability to be impartial. If you look at Miller L., which is really the blueprint for this case, it emphasizes that on a third stage Batson hearing, cross-comparison analysis is really the key to determining whether or not there was discriminatory intent. Number one, if the prosecutor doesn't examine those jurors about the reason that he claimed, and number two, if he doesn't dismiss other jurors who bear that same reason, then that is evidence of discriminatory intent. You have written a very able brief, Counsel, on both of the issues that you've addressed here orally. Thank you. We'll give you an opportunity to respond. Thank you. What about the trial court's failure really to say anything or give an indication that he was considering the evidence and making a finding, not with factual detail, but just simply that based upon the reports that I've received, it's my opinion that the defendant is fit for trial with medication at this time? Clearly it would have been better for the trial court to say explicitly on the record, I find defendant fit to stand trial. But the statute, after a defendant has been found unfit and without medication, and he starts to receive medication, the statute says the court shall conduct a hearing unless waived by the defense and shall determine whether the defendant is fit to stand trial or plead. If he does find, he should proceed and set the matter for trial. Even though the statute says that, do you have a case that suggests that you can waive your fitness? There's no U.S. Supreme Court or Illinois Supreme Court that requires an explicit finding of fitness on the record. Even though the statute is suggesting you can waive this, there's no case that interprets the statute to permit a waiver of a defendant being restored to fitness. There's no case that has applied a waiver so far, but they have applied plain error. And the cases that the defendant addresses are absolutely indistinguishable. And he's saying it was a pro se defendant. And while they stipulated to the fact that the defendant had been found fit, there were medical reports that said he wasn't taking his medication, he wasn't complying with his medication. This case also didn't involve a, the lawyers didn't say we're stipulating to fitness. What they did agree to was stipulate to the testimony that would have been given by the report. Well, while the ASA didn't say the magic words that the expert would testify here, it's clear from the record that this was more than just a mere stipulation to the findings. They stipulated that he had been seen by Dr. Kulik on the 10th floor, that he was, he saw him to render an opinion, that he was found within a reasonable degree of medical certainty to be fit to stand trial, that he was cognizant of the charge, he understood the nature of the proceedings, that he showed the ability to cooperate with counsel, and it discussed the medications that he was prescribed, and he, they said that he was not having any adverse side effects. It's also very clear from the record that his attorney believed, and an attorney probably with some considerable experience in defending patients with a mental health history, that the occurrence of the crime took place in the midst of a psychotic episode, so that the attorney's recommendation would appear from the record to have been not guilty by reason of insanity. That was her recommendation. That was her recommendation. The recommendation of the attorney, which was really, if you think about it, a pretty sound one given the facts surrounding the incident itself, which led to the injury of the patient. He was in the midst of a psychotic episode. At least that could be argued. It could be argued. And if he had followed the advice of his attorney, it could very well be that he would have been found not guilty by reason of insanity. Not guilty but mentally ill, but not guilty by reason of insanity, which is a different issue. And that would have probably been the best thing for him from a legal perspective. There is nothing to support a successful insanity defense, despite the fact that they are very difficult to show. Dr. Kulik examined him and discussed whether or not he was insane at the time. No, that still wouldn't preclude his attorney from suggesting that that's what happened, because ultimately it's for the trier of fact to decide whether or not he was not guilty by reason of insanity. There was nothing to suggest that he could not understand the consequences of his actions at the time. Are you sure about that? Yes. The jury wouldn't believe the defense attorney that saying that he was in the midst of a psychotic episode when he injured the two employees? Even if a defendant's mind is otherwise unsound, it does not preclude him from being fit to stand trial, and it does not give him an automatic insanity defense. There just wasn't a guaranteed success. One of the arguments his attorney is making is that evidence of the fact that he was not fit to stand trial is that he didn't understand what was best for him legally. His right is to waive the insanity defense. That is the whole purpose of a Gettings hearing, a Gettings hearing which presumes a fit. I understand where you're coming from. Do you have any further questions on fitness? No. What about the suggestion that his lawyer said, I don't think he's a competent judge at this point because he's not able to understand that the insanity defense would be appropriate here. Did the attorney basically ask for another fitness determination? No. That's a mischaracterization of defense counsel's motion. What did counsel's motion say? He never said he was refusing to cooperate. What defense counsel said is that he was adamant that he did not want to pursue an insanity defense. He was absolutely cooperating with his self-defense. What did the lawyer say about competency? Is there some mention of competency at all in that colloquy with the court? No. No? No. It does not address competency. What Gettings addresses is the voluntary. It was whether he was making a knowing and voluntary waiver of the insanity defense. If you presume that to be competency, the judge found that he was competent. He was competent to waive the insanity defense, and surely if he's competent to waive the insanity defense, he's competent. Don't you see the catch-22 there? If his attorney is recommending that he enter a plea of not guilty by reason of insanity at the time that the incident occurred, and later on he is so intent on pleading not guilty that he overlooks the value of a plea. From the record, it's clear that he understood the consequences of waiving the insanity defense of what would happen with a successful insanity defense. And his counsel would argue that he was in a position where he couldn't simply understand. Was the lawyer doing that? And that led to the fact that he couldn't really cooperate with his counsel when he really was unaware of the consequences of his plea. The Gettings hearing was not a hearing where she was trying to force him to. There has to be a Gettings hearing if she believes that she wants an insanity defense. And that's what the reasoning of all this was. It had nothing to do with fitness. No. It was the requirement that there be a hearing on the record that he knowingly and voluntarily waive his right to have or to present a not guilty by reason of insanity defense. And after they went through the understanding, defense counsel said, you know, just to be sure, can we get this on the record, his reasons. And the court got his reasons on the record. And his reasons were? His reasons were that he thought he had a successful self-defense. He believed he was not guilty. Basically, his reasons were he didn't want to go back to Chester. And he didn't want to be in a mental. Did he use the word self-defense? He said, I'm not guilty. I didn't do it. Self-defense, yeah. He used the word self-defense at one point. Yes. He did. He said, look this exact. He said, I'm not guilty. I don't know if I did. They were attacking him with mattresses. No, it started because of medication. I thought he didn't want to take his medication. He was on the phone for a long time with his mother. They wanted him to get off the phone. And they were also trying to give him medication. No. He was on the phone with his mother for an hour. He was screaming. He was yelling. He was urinating in the hallway. They tried to talk him down for an hour. At the very end, they asked him, please calm down. Would you please come to the quiet room? Would you like to take some medication to help you calm down? No one was forcing him to. But didn't he later say they were trying to force him to take medication or not? That's what he said, but none of the other witnesses said that. His vantage point, he was being forced, or at some point it seemed to him that he was being forced to take medication. They said it wasn't about the medication. He was causing a disturbance. He was causing a disturbance. And at some point they were going to try to subdue him with mattresses, right? Yes. And his defense was that he was defending himself against the onslaught. A final matter on this, if this case were to be remanded, the people would argue that it should be for the limited purpose of the judge to put an explicit finding of fact on the record. Or a fitness hearing. I don't think another fitness hearing is necessary. There's plenty of evidence on the record that he was fit to stand trial. There's no evidence that he was not. Moving to Batson. The trial judge is in a superior position to determine the credibility of the prosecutor. Demeanor is often the best evidence of the prosecutor's credibility. And the trial judge here believed the people to be credible, that he found a race-neutral reason for striking the two veneer members. Do you know how many African Americans were on the jury? There's absolutely no record of that. How many were in the veneer? No record of that. And the court has no basis for making comparison between seated jurors and rejected veneer members where defendant has failed to make a record of the racial makeup of the seated jury. That's Townsend, cited by People v. Davis. That's an Illinois Supreme Court case from 2008. So, you know, case laws held that prosecutors believe that a potential juror has liberal views just because they're a social worker is a race-neutral one. That is the reason that they put forth in the trial, that is the reason that the judge accepted. He clearly stated on the record that this was a race, he was finding a race-neutral reason for striking those jurors. And it is just not clearly erroneous, not from the record that we have. Thank you, Counsel. Your brief was also very helpful, as was the brief of the appellant. Thank you. Counsel, do you want to sum up? I'd just like to address a couple issues. Number one, there was a factual misstatement. There was a lot of evidence that he was refusing medication at the time of the offense. Two of the state's witnesses said that he was shouting, they want to give me a shot, they're trying to give me medication, when this occurred. And there was also the stipulated testimony of Detective Esposito that Catala said he was screaming, they want to give me a shot, when this occurred. The second thing is to address Justice Gordon's point on the cases on waiver. There are actually cases that say specifically, defendant cannot waive competency. And that's Pavey Robinson and Contorno, Sandeman, Smith, and that all of those say you cannot waive competency. Well, what would you have recommended that the trial judge do in this particular case where they had a 402 conference? They tried to resolve this case, didn't they? They did. I think in this case, number one. We don't know what the trial judge said in the course of that conference. We don't. No. But number one, he had to ask whether or not he was taking his medication. Number two, he should have ordered another behavioral clinical examination. Even if he understood what the whole circumstance was, he can't direct counsel for the defendant on what kind of a plea ought to be entered, can he? No. No, Your Honor. But it is the trial court's duty to ensure that the defendant is competent to stand trial. Which includes, presumably, his understanding of his plea. It includes, at a minimum, the understanding of his pleas. But it also includes everything necessary to assist counsel in their defense. The defendant has to be able to talk with counsel, be willing to give her information for her to prepare. If he's not willing to talk with her on items because of the defenses that she's raising, if he's not willing to cooperate with psychiatrists on these issues, then she's hamstrung. There's nothing she can do. And that's, again, why we have this requirement that he has to be able to assist counsel in his defense. Otherwise, it would just be a rational understanding of the nature of the proceedings. So that before we can allow a defendant to decide how he's going to plead, we've got to make sure that what? That he's fit to stand trial, that he understands the nature of the charge against him, or both? And that he can cooperate with counsel. That he can cooperate with counsel in his defense. For the same reason that this Court held in the saying that we're not going to make that decision, the trial court has to make that decision before allowing the defendant to make all these decisions. Otherwise, these aren't competent decisions. And the last thing about fitness is that defense counsel did request additional help. The motion specifically says that she wanted the trial court to evaluate his competency to weigh the insanity defense. And then when the hearing occurred and the trial court was examining him, defense counsel pushed for more examination. And she says she'd like to go over the reason again because she didn't think that he was understanding. And then the trial court said, he just said it. He thinks he doesn't want to assert the defense because he thinks Chester is dangerous. And he says, yes, danger is extremely dangerous. They tried to kill me. So when she was trying to press for more examination, the trial court refused to do so. And at that point, I'm not sure what more defense counsel could have done, but the trial court had enough information to order a new fitness evaluation and then hold a hearing. And then one last thing about Batson is that evidence on – Did you – is the record preserved under Townsend for the Batson claim? Not the racial composition of the entire jury, but that's not necessary because it's only for a prima facie case. Here we already have a prima facie case. So once we have a prima facie case under – But you only had it for the two jurors. Right. And the court found that those were race-neutral reasons. So where do you go from there? Well, we have – what we have is – Is that an abuse of discretion standard that we're looking at? Yeah. Or de novo? It's clearly erroneous. It's clearly erroneous. Yeah. So if you look again – and the Illinois Supreme Court cases – do you believe that we can say that when he said those were race-neutral that that decision was clearly erroneous? Yes, Your Honor. Miller L states exactly that. If the stated reasons – if the reasons offered by the prosecutor are not true, if they don't apply to other jurors that he didn't dismiss, then that is evidence of discriminatory intent. Here it doesn't matter what the race of Jennifer Rafferty and Beatrice Thomas is because if the prosecutor actually cared about social workers, he would have dismissed them whether they were white or black. He would have questioned them. Miller L repeatedly says if the prosecutor had truly cared about this, he would have questioned the jurors on those issues. He never questioned a single one. He had seven perumptories at the beginning of trial. There were at least seven social workers. He never questioned them. He just dismissed the two that were black. Okay. Let me ask you this. If a jury is made up of ten blacks and two whites, can there still be an abasement claim? Yes, Your Honor. The reason is because as long as there is a single discriminatory act, it doesn't matter how many non-discriminatory acts he did. He could have been non-discriminatory in plenty of aspects of the trial. But if he discriminated against those two potential jurors because of their race, then that's a violation. So, therefore, if ten out of twelve people are African-American, that wouldn't be any evidence of anything? Your Honor, that is evidence that's relevant to a prima facie case. But, again, Miller L says we don't look to the black jurors that he kept. In Miller L, they kept black jurors. But the point of Miller L is we look to the stated reasons. We look to see whether he questioned the jurors on those reasons to see if they're sincere. And we look to see if there were other jurors that he didn't dismiss who bore those same characteristics. Here we have exactly those three things. He never questioned them. There are other jurors that have the same characteristics. And here, actually, we have another one, which is it didn't make sense in the context of this case because the victims, the state's witnesses, were nurses and counselors. So, with all of that, under Miller L, it's very clear that this was clearly erroneous. Where the stated reasons do not fit the facts and they don't hold up, that is an abuse of discretion. That is a clearly erroneous holding. Thank you. Counselors, thank you both. The case was well argued, well briefed. It will be taken under advisement. We have to take a short recess.